STANDING COMMITTEE ON PROFESSIONAL
CONDUCT FOR THE UNITED STATES
DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
IGNACIO E. SALCEDA (SBN 164017)
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: 650-320-4908
isalceda@wsgr.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NICOLE LOPES,<br><br>　　　　Respondent, | Case No.  4:25-mc-80394-HSG<br><br>**FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT SUBMITTED PURSUANT TO LOCAL RULE 11-6(e)(3); ORDER** |

On March 6, 2025, Judge Jeffrey S. White referred attorneys Nicole Castronovo, a former associate at the Los Angeles law firm Seki Nishimura & Watase LLP, and Bill Seki, a partner of the firm, to the Standing Committee on Professional Conduct ("Committee"). Castronovo is listed in the docket, pleadings, and transcripts under both her married name, "Nicole Lopes," and as "Nicole Castronovo." Since she is divorced, this Order refers to her as "Castronovo."

The referrals stem from the conduct of Castronovo and Seki in a criminal trial in *United States v. Wenger,* No. 4:23-CR-00269-JSW-3, resulting in Judge White granting a mistrial at Castronovo's request.

This Order relates solely to Castronovo. The referral as to Seki is addressed in a separate order. The discussion below focuses on the facts directly relevant to the Castronovo referral.

**Background**

In August 2023, the United States Attorney brought several criminal indictments against officers of the Antioch Police Department for a variety of crimes.[1]

Devon Wenger, an Antioch police officer, was charged in two criminal cases. The case at issue here is *United States v. Wenger, et al.*, 4:23-CR-00269-JSW-3, where Wenger was charged with two co-defendants—Morteza Amiri and Eric Rombough—with conspiracy against rights. Each defendant also faced additional individual charges: Amiri was charged with four counts of deprivation of rights under the color of law and destroying records in a federal investigation; Rombough was charged with two counts of deprivation of rights under color of law; and Wenger was charged with one count of deprivation of rights under color of law.[2]

Wenger was initially represented by other attorneys. Castronovo entered an appearance on

---

[1] "Antioch And Pittsburg Police Officers And Employee Charged With Various Crimes Ranging From Using Excessive Force To Defrauding Their Employers," U.S. Attorney's Office for the Northern District of California, Aug. 18, 2023, https://www.justice.gov/usao-ndca/pr/antioch-and-pittsburg-police-officers-and-employee-charged-various-crimes-ranging.

[2] In a separate case, *United States v. Wenger, et al.,* No. 4:23-CR-00268-JSW, Wenger was charged with a co-defendant with conspiracy to distribute and possession with intent to distribute anabolic steroids, and destruction of records in a federal investigation. Castronovo did not represent Wenger in that case and it is not the subject of this referral. Wenger was convicted following a jury trial in that case in April 2025.

1  behalf of Wenger on May 28, 2024. Dkt. 100.[3]

2      There was extensive motion practice regarding a motion to sever Wenger's case, Dkt. 112,

3  and a motion to suppress evidence obtained by the government from Wenger's cell phone. Dkt.

4  103. Those motions were followed by an additional motion to suppress (Dkt. 161), a motion for

5  reconsideration of the Court's order denying the previous motion to suppress (Dkt. 176), a motion

6  to dismiss (Dkt. 185), a second motion to dismiss raising several claims, including a claim of

7  ineffective assistance of previous counsel (Dkt. 187), as well as several "supplemental" briefs

8  concerning these various motions. Dkt. 197, 207, 209.

9      On December 3, 2024, Judge White issued an order setting a pretrial conference for

10  February 10, 2025, and a jury trial for March 3, 2025. Dkt. 215. On December 9, 2024, Castronovo

11  responded to the scheduling order, explaining "the current trial dates are unworkable and

12  prejudicial" due to "late disclosure of critical evidence" by the government, the "complexity of the

13  case," "defense counsel's preexisting trial obligations" and "the potential for a miscarriage of

14  justice." Dkt. 221. The following day, Judge White issued an order maintaining the dates as set,

15  ruling that Castronovo's "objections are without merit." Dkt. 223 at 2.

16      On February 4, 2025, Judge White issued an order to show cause to Castronovo, noting she

17  "has not filed any motions in limine or objections to the government's exhibits," and ordering her

18  "to file a statement regarding any information that the Court needs to know that could impact the

19  trial in this case." Dkt. 286. On February 6, 2025, Castronovo responded that she "made strategic

20  choices regarding motions in limine and exhibits" and expressed no objection to the government's

21  proposed exhibits. Dkt. 293 at 1-2.

22      Judge White held a pretrial conference on February 10, 2025. Dkt. 299, 309. At the outset,

23  he noted he had "received a demand from defendant Wenger for the Court to conduct an in camera

24  review of the prosecution file," and admonished Castronovo that she "should file the motion on the

25  docket." Dkt. 309 at 5. He also noted there "seems to be a continuing problem" with Castronovo

26

27  [3] All Docket references are to filings in *United States v. Wenger, et al.*, 4:23-CR-00269-JSW-3.

2

28

filing "iterative and late breaking motions" that "are disruptive and inappropriate" and "not appropriately supported by a declaration or affidavit as required." *Id.* at 5. Judge White continued that Castronovo had filed several "unauthorized supplemental brief[s]," and had not complied with the Court's standing order for criminal cases concerning the timing and length of briefs, so he did not consider several motions and briefs filed by her. *Id.* at 11. Judge White also noted "this is not the first time that counsel, Ms. Castronovo, has filed briefs on motions not permitted by the Court's orders or procedures," "not the first time that the Court has declined to consider or even struck a filing by Ms. Castronovo," and again "admonish[ed] Ms. Castronovo and Mr. Wenger and warn[ed] that further such filings, meaning filings not allowed by the federal rules, by this Court's standing orders or otherwise not authorized by a leave of court, will result in an order to show cause why sanctions should not be imposed, including monetary sanctions, on either or both Ms. Castronovo and/or Mr. Wenger." *Id.* at 11-12.

Subsequently, on February 18, 2025, Judge White admonished Castronovo for "repeated violations of this Court's rules or procedures," detailing nine specific violations. Dkt. 316 at 4-7.

**The Trial**

A jury was selected on February 26, 2025. Dkt. 333.

On March 3, 2025, the trial was set to begin with opening statements. Before calling in the jury, Judge White noted that he had ordered Castronovo at the pretrial conference to file the motion for review of the prosecutor's file on the docket, and no such motion had yet been filed. Dkt. 359 at 6-7. Castronovo responded "We are having a problem with our staff right now. For example, I did all my trial binders myself. I left at 1:00 in the morning to get here by 7:00. The things I'm asking for are falling through the cracks. So if I can just have today and will speak to the managing partner and have him have the office manager file it today, no question." *Id.* at 7. Judge White denied her request for extra time. *Id.* at 7.

The trial went forward on March 3, 2025, and during the day Judge White noted several instances where he thought Castronovo was unprepared. *See* Dkt. 359 at 98, 105, 198, 199, 206-07.

On March 4, 2025, the second day of trial, Judge White issued an order to Seki. Dkt. 344. The order began:

> From the beginning of the trial, Ms. [Castronovo] has continuously represented that she is either unable to comply with Court orders, to review timely documents produced by other parties, or to otherwise keep up with the pace of the trial. Ms. [Castronovo] has represented that the firm has undergone recent significant "management" changes, and that she is the only person in her fifteen-person firm who is assigned to this case. This lack of support has not only affected the pace of the trial, but also counsel's ability to comply with deadlines and court orders. For example, most recently, upon having made unfounded representations against government counsel about discovery and Brady issues, the Court issued an order which requires a response by tomorrow morning. Ms. [Castronovo] responded that she may not have adequate support to enable her to comply with the Court's order.

Dkt. 344 at 1.

The Court ordered Seki "to explain why counsel has failed to receive the administrative support which counsel contends she has not received" and "to supply forthwith whatever assistance counsel requires to enable this Court to continue efficiently conducting this trial." Dkt. 344 at 1-2. Judge White also expected the firm to send "one or more attorneys or paralegals to attend court beginning tomorrow morning to support Ms. [Castronovo]." *Id.* at 2.

Seki responded that same day, explaining that one of the firm's partners had resigned and her work had to be reassigned to other attorneys. Dkt. 345 ¶ 4. Additionally, the firm was preparing for two other trials, though one ultimately settled. *Id.* ¶ 5. Seki noted the only firm attorneys with criminal law experience were Castronovo and himself, and he was unable to participate in the trial because his spouse had been hospitalized. *Id.* ¶ 7. He offered remote support, as well as the remote support of administrative staff and that, while no one could be present in court on the next trial day, the firm was "trying to see if we can provide physical support for Ms. [Castronovo] for the remainder of trial, if needed." *Id.* ¶ 9.

Judge White issued a response shortly after (also on March 4), finding Seki's "response to be too vague to fully address the Court's concerns" and expected "the firm, through Ms. [Castronovo] or otherwise, to be prepared to tell the Court when it reconvenes tomorrow morning

what specific additional help it has provided to Ms. [Castronovo] since the Court's order and which it will continue to provide throughout the course of the trial." Dkt. 346.

Seki submitted another declaration, explaining a paralegal and investigator would arrive in Oakland the next morning, March 5, 2025, to assist for the rest of the week, that an associate attorney would be arriving to assist Ms. Castronovo the week of March 10, and that the firm's "administrative staff remain[ed] to assist remotely." Dkt. 347 ¶¶ 3-5, 7.

**The Court Grants Castronovo's Request for a Mistrial as to Wenger**

The next day, March 5, before the jury was brought into the courtroom, Castronovo requested a sidebar with Judge White and one government attorney. Dkt. 361 at 4-5. She stated, "this has been taking a tremendous toll on my health doing this by myself," and said that she had "slept like a collective maybe ten hours in the last matter of—since last Wednesday." *Id.* at 5. Seki's declarations put her "in a very uncomfortable position," and she needed "to tell the truth" which was "going to cost me my job, and it will have me removed" from the panel of attorneys who represented police officers, meaning "I may never practice in this practice area again." *Id.* at 5. She continued that the associate attorney the firm offered to send to assist with trial "does me no good" because he did not have criminal law experience. *Id.* at 6. She believed "what [Seki] has basically proposed is worthless to me." *Id.* at 7.

When Judge White pressed her to tell "me what you would like the Court to do or not do," Castronovo stated "I don't think it is effective assistance of counsel for this to continue." Dkt. 361 at 8. When Judge White asked "are you asking…to be relieved?" Castronovo responded "I'm asking for a mistrial." *Id.* at 9. Castronovo continued:

> I have begged them for months to give me back a second chair. It's not that I haven't tried. I was scared to put -- my boss sees everything that comes in through the ECF because my secretary forwards it to him. So, he hasn't been involved but he wants to know what is going on. So, I didn't want to put that in writing. I didn't know how to do it; that I was going to them for months saying this is not working. I need help. I can't do this.
> I'm getting discovery I can't review. I told them all of this. This has affected my ability to present this case. And, to be frank, that discovery that was sent to me by

> [the prosecutor], I still haven't gone through that because each day preparing for a witness and it's -- this is why this is ineffective assistance of counsel.
> All along these deadlines have been coming up. The reason I think -- I thought I had some grasp -- because I had been meeting them for the most part -- but that caused me staying up all night for multiple nights after my children went to bed, and I just soldiered on because they told me there were no options. I asked and asked and asked. I was afraid if I put that in writing, that I would get fired. I have three children. It is not if I sat on my laurels and didn't do anything and didn't try to make it better.

Dkt. 361 at 11-12. Castronovo noted that "everybody has three, four lawyers," and while she had been a second chair attorney with other police misconduct defense attorneys in the past, "this has been terrifying for me because I'm not them and then I'm doing this alone." *Id.* at 13.

After a break, the hearing resumed, Judge White ordered the courtroom sealed, and asked Castronovo to make a record of her request for a mistrial. Dkt. 361 at 13-14.[4] She explained the staffing issues at the firm and lack of support she had received, *id.* at 17-21, her busy trial calendar, *id.* at 21, the fact that trial subpoenas she requested had not been sent out, which required her to prepare them herself, *id.* at 21-22, her personal challenges, *id.* at 23, and that she had been "berated" and "yelled" at by firm management when she complained to them in December 2024 that she was overworked and needed help. *Id.* at 27.

Castronovo explained she "had a friend sit in the audience to take notes for me," and got two police officers to volunteer to make her trial binders the night before trial started, and "barely made it to Oakland in time for court because I had to work on those binders; drive through the night and get here and do my best." Dkt. 361 at 28-29. She continued, she was "not used to the system," meaning federal court, and had trouble keeping up with jury selection which required her to ask her client to help organize her notes of jurors. *Id.* at 32. She had been unable to review the rolling discovery produced by the government during trial. *Id.* at 34. The help offered by the firm would be "useless." *Id.* at 35.

Castronovo concluded by saying that she had "aired all of my dirty laundry" and "this is not

---

[4] The transcript was unsealed by Judge White on March 24, 2025. Dkt. 420.

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

a stunt." Dkt. 361 at 36. She believed she "will probably get fired" and "no longer be employable as a police attorney," but nonetheless believed "to proceed as solo trial attorney in this case given everything that I have told the Court and reflected upon…would be ineffective assistance of counsel." *Id.* at 37.

The government opposed a mistrial and suggested a two-day recess to allow Castronovo to "catch up on the discovery produced" and "interview and subpoena the witnesses that she needs." Dkt. 361 at 40. Amiri's counsel stated he initially thought a recess was a good idea but upon further reflection, and the interactions he and his co-counsel had with Castronovo "over the last few days, I am very concerned about her ability to proceed including various sidebar conversations, comments, and so on," and "as an officer of the court based on my observations over the last few days, I do have to say I'm very concerned about Ms. [Castronovo] continuing." *Id.* at 41. He believed the Court should grant Wenger a mistrial, but sever Amiri to allow his trial to continue. *Id.* at 41-42.

The Court addressed Wenger, explaining that the constitutional protection against double jeopardy would not bar a retrial because his attorney was requesting the mistrial. Dkt. 361 at 45-47. Wenger said he understood and did "not feel that she is ineffective assistance of counsel if she had adequate support." *Id.* at 48. He believed Castronovo "is the best attorney that I have ever encountered" but "right now she simply does not have adequate support" and "I have seen her breaking down, and I'm very concerned for her mental health, Your Honor. And I do not feel that without adequate support she can proceed, and I don't think that there's anything that can remedy this." *Id.* at 48-49. After a brief recess to allow Wenger to consult with Castronovo, Wenger confirmed that he believed "a mistrial is appropriate." *Id.* at 55. Judge White "reluctantly" granted Castronovo's motion for a mistrial. *Id.* at 66.

In an order issued later on March 5, 2025, Judge White explained the history of the case up to that point. Dkt. 350 at 1-6. Judge White "personally observed Ms. [Castronovo's] behavior escalating throughout the course of the proceedings," noting she "has appeared increasingly emotionally distraught, and at times she has wept in the courtroom," "has repeatedly apologized

7

and made self-deprecating comments while questioning witnesses or addressing the Court. Her cross-examinations have been meandering and repetitive. She often appears to be engaged in a stream of consciousness when she addresses the Court or in her preambles to witness questions," "has made unfounded representations to the Court regarding conduct of Government counsel as a result of Ms. [Castronovo's] inability to review and assimilate documents produced by the Government," and "has been unable to comply with Court deadlines." *Id.* at 6. It was "clear to the Court that Ms. [Castronovo] has not been able to keep up with the pace of trial. The Court finds that Ms. [Castronovo's] conduct falls below an objective standard of reasonableness." *Id.* at 7.

The Court found Castronovo's "emotional state and administrative capacity is such that she is not competent to effectively represent Mr. Wenger for the remainder of the trial." Dkt. 350 at 8. In a separate order, on March 5, 2025, Judge White directed Castronovo and Seki to self-report the mistrial to the State Bar. Dkt. 352.

On March 6, 2025, as discussed below, Judge White referred Castronovo and Seki to this Committee. *See* Referral Letter from Judge White to Judge Gilliam.

**Developments After the Mistrial**

Amiri's trial continued without Wenger. On March 13, 2025, the parties appeared before Judge White as the jury was deliberating. Dkt. 426. Amiri's counsel informed the Court that the previous day, Castronovo and Wenger appeared on a YouTube podcast where they "asserted and were celebrated with the other guests of the podcast" that Wenger "had gotten off on the case." *Id.* at 4-5. Amiri's counsel continued that Castronovo "described how it was part of her strategy to separate her client, Mr. Wenger, from Mr. Amiri because being in Mr. Amiri's presence, in particular being exposed to the text messages from Mr. Amiri, were harming Mr. Wenger; so, therefore, she executed this strategy to separate herself from our client which, of course, all of us here knows that's absolutely false." *Id.* at 5. Judge White indicated that he would unseal the mistrial order and transcripts concerning the mistrial, noting it was appropriate when "the beneficiary of a sealing order chooses to put out information in the public about what went on,

whether it's true or not." *Id.* at 5-6.

On March 14, 2025, the Court issued an OSC to Castronovo as to why the transcript and mistrial order should not be unsealed. Dkt. 387. It noted that since the mistrial, Castronovo had made numerous public statements that not only suggested she had "given up her right to privacy," but also "committed violations of her professional responsibility obligations through subsequent public commentary on the trial." *Id.* at 2. Those statements included:

- Telling KQED on March 5, 2025, "'It was an unexpected outcome. The way the media ran with him and the optics and dynamics of how this whole Antioch story unfolded, it was a very difficult case to present because of that;'" Dkt. 387 at 2;[5]

- Issuing a press release on March 10, 2025 on Instagram, stating "'Much of what has been run in the media about Wenger's mistrial was speculation or false due to the truth being sealed by the court. While, we are unable to tell the full story - here is our press release. To my LEO family - please share this just ending to another politically motivated prosecution,'" "'Through the dedication and relentless advocacy of Nicole, justice ultimately prevailed;'" and "'This case was never about justice—it was about silencing me. . . The prosecution lied, withheld evidence, and waged a smear campaign against me. But the government failed.'" Dkt. 387 at 2;[6]

- Appearing on a YouTube podcast, where she made several statements, including:

  o "the Government 'slept on her' and underestimated her ability to get a favorable outcome for Wenger. She further stated, 'Here's the beauty of where Devon is now, and no one saw this coming because everyone thought I was a fucking idiot, and some reporter in the Bay ran that after the mistrial, that there was a mistrial because I, I looked crying and disheveled and a mess leaving court, like all sorts of crazy shit;'" Dkt. 387 at 3;

  o "'I'm still practicing as I was before. All the good stuff. I am ready, willing, and able after I have my much needed R&R from this sucky absolute guerrilla warfare that I've been in with Mr. Wenger, but no, I'm still where I am. I only made that comment because I had, it didn't make the splash down here but because the Bay Area was reporting me as crying and disheveled, that you guys thought I was a bitch now and not about it anymore or something, so I want to make sure that everybody knows that's not the case. If I made it seem that way, no.'" Dkt. 387 at 3.

---

[5] "Bay Area Police Conspiracy Trial Shaken Up by Mistrial for 1 of 2 Former Officers," *KQED*, Mar. 5, 2025, https://www.kqed.org/news/12029643/bay-area-policeconspiracy-trial-shaken-up-by-mistrial-for-1-of-2-former-officers.

[6] The Committee was unable to view the Instagram post or the pleading submitted by Amiri's counsel under seal informing the Court about the post. *See* Dkt. 373.

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

Judge White believed the comments—made while Amiri was still in trial and the jury was deliberating—suggested "to the media and to the public...that Amiri is guilty, or at least more culpable than Wenger" and "that [Castronovo] sought a mistrial strategically and not out of necessity, *i.e.*, based upon her own admitted inability to effectively represent her client; and that the Government engaged in misconduct." Dkt. 387 at 3. The comments were also made "without concern for their potential impact on Amiri's right to a fair trial." Dkt. 387 at 3.

Amiri's trial concluded on March 14, 2025, with the jury returning a split verdict, finding him guilty on only two of the five charged counts. Dkt. 390. Critically, Amiri was acquitted of conspiring with Wenger to violate civil rights.

On March 20, 2025, the Court issued an OSC to Castronovo to determine whether she would continue to serve as Wenger's trial counsel in the event of a retrial. He was "tentatively inclined to find that Ms. [Castronovo] is incompetent to represent Wenger at trial." Dkt. 404 at 1. That same day, Seki submitted a declaration explaining the firm had informed Castronovo of the numerous Court orders seeking a response from her. Dkt. 406. Although Castronovo "acknowledged receipt of the Orders from the Court and is aware of the deadlines related to such Orders," Seki stated that she was on "medical leave" and so "unable to respond to the Court's orders." Dkt. 406 ¶¶ 4-6.

The next day, Judge White issued an order stating it did "not recognize Ms. [Castronovo's] 'protected' leave" and that she was "required to fully comply with Court orders." Dkt. 408 at 1. He continued "The firm is responsible for Ms. Lopes' conduct and for providing effective counsel to...Wenger" and "must ensure compliance with the Court's orders," and confirmed that "Failure to comply may be punishable by contempt." *Id.* at 2.

On March 24, 2025, Judge White ordered the mistrial order and the transcript of the March 5, 2025 hearing unsealed, noting that Castronovo never responded to the OSC concerning unsealing. Dkt. 420.

On March 25, 2025, the Court held a status conference concerning Wenger's retrial. Judge

White ordered Seki to review the statements made by Castronovo on March 5, 2025 concerning her request for a mistrial, and ordered him to submit a declaration "regarding the firm's position on these statements." Dkt. 428 at 6. He wanted "the truth from the perspective of the firm because I believe that…statements were made to the Court that may not have been keeping with the obligation of candor to the Court." *Id.* at 6.

Judge White next addressed the issue of Wenger's representation. After reciting the background leading to the mistrial, he noted "there's nothing before the Court whatsoever from which the Court can infer that Ms. [Castronovo] will adequately prepare herself next time around even with the benefit of co-counsel." Dkt. 428 at 9. He noted the firm could not identify co-counsel for her and promised only "vague administrative resources" which were insufficient. Dkt. 428 at 8. It appeared Castronovo "did not even try to…access significant amounts of discovery until the week before jury selection." *Id.* at 9. Given the referral to the State Bar, Judge White believed there may be a conflict of interest between Wenger and Castronovo. *Id.* at 10. He questioned "her duty of candor," noting comments she made to the press "implied that she made serious misrepresentations to the Court regarding her abilities and her mental state." *Id.* at 11. Finally, he told Wenger that Castronovo's actions significantly prejudiced him because Amiri was acquitted of conspiracy, meaning the "the mistrial may have deprived you…of a favorable outcome at trial with respect to the conspiracy charge." *Id.* at 11.

Judge White discharged Castronovo and Seki Nishimura & Watase LLP and directed Wenger to find new counsel. He indicated he would issue an order with his findings and ordered Castronovo to serve that order "on any judge of this court in front of whom she appears in the Northern District of California upon her notice of appearance, assuming that she is not disciplined by the appropriate authorities." Dkt. 428 at 12.

Judge White also addressed this Committee's investigation. He explained this Committee was concerned with "the competence writ large of Ms. [Castronovo] to be a member of the bar of this Court." Dkt. 428 at 17. In contrast, his "responsibility is to determine whether the lack of

1  candor was visited upon this Court, whether there's been fraud on this Court, or the kind of

2  misconduct that may result in further action by this Court and an affront to the jurisdiction and the

3  integrity of this Court." *Id.* at 17-18. He commented the investigations were "different" and "both

4  proceedings will get the truth and they will go their different ways depending upon the way they

5  view the evidence." *Id.* at 18.

6          On April 18, 2025, Seki filed a declaration as directed by Judge White. Dkt 440. He stated

7  the firm had been approached by a legal defense fund to represent Wenger and that Castronovo

8  "stated that she wanted to take the case" and "assured me that she was capable of handling the case

9  and she begged to take the case." Dkt. 440 ¶ 4. He continued that "at no time did the Firm ever

10  commit to provide a full time second chair" to Castronovo. *Id.* ¶ 5. Seki asserted that Castronovo

11  had asked for an associate "to be assigned to her full-time to assist her on **all** of her cases" and the

12  request was denied. Dkt. 440 ¶ 5 (emphasis in original). An associate had worked on the Wenger

13  case through November 2024, but Castronovo never asked for any additional associate assistance

14  on the case afterwards. Dkt. 440 ¶ 5. Seki asserted Castronovo "did not beg or even request[] to

15  have a second chair returned," and there was never any conversation between firm management

16  and Castronovo about having an associate participate at trial. Dkt. 440 ¶ 5. Castronovo was never

17  "berated or yelled at by any partner in the Firm." *Id.* ¶ 6. Rather, in November 2024, Castronovo

18  "asked for assistance on her other matters/cases assigned to her so that she could focus her efforts

19  on preparation for Wenger" and as a result, her "case load was reduced." *Id.* ¶ 6. Seki claimed

20  Castronovo "did not respond to the requests from her legal assistant regarding the preparation of

21  trial/witness binders" and her first request for assistance with trial binders was on Sunday March 2,

22  2025, at approximately 3:00 p.m., the day before trial was set to begin. *Id.* ¶ 6. Similarly, Seki

23  wrote "the subpoenas requested by Ms. [Castronovo] were in fact prepared and returned to her for

24  review on February 26, 2025." *Id.* ¶ 6. Seki concluded that Castronovo "had the necessary time and

25  support to prepare for her representation of Wenger," and that upon reviewing the transcript of the

26  hearing where Castronovo sought a mistrial, he was "was extremely surprised by the

27

28

1   representations made by Ms. [Castronovo] to the Court." *Id.* ¶ 11.

2          Judge White ordered Castronovo to respond to Seki's declaration. Dkt. 441 at 1.

3   Castronovo responded on May 2, 2025, noting that she "did not get any meaningful help" from the

4   firm during "the month of February 2025." Dkt. 451 ¶ 3. She felt that had she been given help,

5   including a second attorney, she "would not have experienced a mental health breakdown that

6   negatively impacted my representation of Mr. Wenger and detrimentally affected my career, my

7   life, and my wellbeing." *Id.* ¶ 4. She asserted she had been promised a second attorney at the time

8   she convinced the firm to take the case but when a partner had left the firm suddenly in December

9   2024, that second attorney had been removed from the case. *Id.* ¶¶ 7-8. Had she known she would

10  not have had a second attorney to help, she would not have asked to represent Wenger. *Id.* ¶ 8. By

11  December 2024, Castronovo's "anxiety and depression escalated due to my heavy workload and

12  the burnout that I began experiencing in July 2024." *Id.* ¶ 12. When she raised this to Seki, he said

13  "in a demeaning tone" that "'maybe you were not meant to be an attorney.'" *Id.* ¶ 12. She

14  continued to prepare for trial, though she asserted the trial subpoenas she requested were prepared

15  late and incomplete. *Id.* ¶¶ 15-17. She went to the office in Los Angeles at 6:00 a.m. on March 2,

16  2025—the day before trial was scheduled to start in Oakland—to prepare the trial binders with two

17  police officer friends who volunteered to help with the binders. *Id.* ¶ 19.

18         Wenger retained new counsel and his retrial ended on September 18, 2025, with the jury

19  convicting him of conspiracy, the charge of which Amiri was acquitted at the first trial. Judge

20  White dismissed the other count against Wenger. Dkt. 593, 595, 596, 601. On December 2, 2025,

21  the Court sentenced Wenger to a total of 90 months of incarceration on the counts on which he was

22  convicted in his two cases. Dkt. 643. A notice of appeal was filed on December 8, 2025. Dkt. 646.

23                                   **The Referral to the Committee**

24         On March 6, 2025, Judge White referred Castronovo and Seki to the Committee. *See*

25  Referral Letter from Judge White to Judge Gilliam. Following a summary of the events leading to

26  the mistrial, Judge White explained that Castronovo "prejudiced her client's rights" as "Wenger

27

28

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

1   now faces the possibility of retrial." Referral Letter at 8. Judge White believed the "government's

2   rights were also impacted by the mistrial," because retrying Wenger "will necessarily involve

3   duplication of witness testimony and attorney argument." *Id*. Finally, Judge White believed "the

4   public's rights were impacted by the mistrial," as the case "comes amidst significant tension

5   between Antioch residents and the police department," and "rumors and fears surrounding Mr.

6   Wenger's uses of force under color of law were not tested in the adversarial crucible of the

7   courtroom." *Id*. Judge White concluded the mistrial "may have been avoided if Ms. [Castronovo]

8   had been able to effectively discharge her duties to her client, and if Mr. Seki had adequately

9   supervised and supported his associate." *Id*.

10                          **The Committee's Investigation**

11          The Committee reviewed the extensive record in the case and additional information. The

12   Committee interviewed Seki and Castronovo separately. Each was represented by counsel. The

13   Committee also received and reviewed written submissions from counsel and a significant number

14   of documents, including internal firm documents reflecting the work Castronovo did on the case as

15   well as other matters, communications reflecting her requests for help in preparing for the trial, and

16   letters from clients, including Wenger, as well as friends speaking to her good character and

17   excellent client service. The Committee also reviewed the YouTube video of Castronovo and

18   Wenger's participation in *10-19 The Watch Commander: Cops in The News*, which was recorded

19   on March 11, 2025, while Amiri's trial was still in progress, as well as other public statements

20   made by Castronovo about the trial.

21                              **Conclusions**

22          All this background is necessary context to understand the question lurking in this referral:

23   did Castronovo lie to Judge White to get a mistrial and sever Wenger's trial from Amiri's trial?

24   Following a comprehensive review, the Committee believes the answer to that question is *no*.

25          Rather than lie to get a mistrial, the Committee believes that Castronovo (and Wenger) tried

26   to portray the mistrial as a victory in the YouTube interview, and in other public statements. As

27                                     14

28

detailed below, the mistrial was certainly not a victory for either Castronovo or Wenger.

We believe Castronovo was truthful when she told Judge White on March 5, 2025 that she believed a mistrial was necessary because she was providing ineffective assistance of counsel. This was Castronovo's first ever federal criminal jury trial. Federal criminal trials are more formal than state court trials, with more rigid procedures, filing requirements and deadlines. A trial with a co-defendant is even more difficult; and this trial in particular was high profile and controversial, with significant amounts of discovery and press attention. To make matters worse, Castronovo was trying the case in a District where she did not regularly practice, hundreds of miles away from her home and office, without any assistance from a more senior attorney, or even a local attorney who knew the District's practices generally, or had experiences with Judge White specifically. Castronovo was trying the case alone; as she told the Court, the government had three prosecutors present during trial plus law enforcement agents; Amiri had two lawyers at trial.

The challenges Castronovo faced were evident long before the trial began. She had been repeatedly admonished by Judge White for deficient filings and unfamiliarity with the Federal and Local Rules. She did not file motions in limine, was preparing her trial binders in Los Angeles the night before the start of trial in Oakland, and drove hundreds of miles all night, before giving her opening statement. During the trial, Judge White admonished her for how she was questioning witnesses and repeatedly making self-deprecating comments about herself. Amiri's counsel noted he had concerns about Castronovo based on his conversations with her; Wenger told Judge White he was concerned about Castronovo's mental health.

Nothing captures how unprepared Castronovo was for trial than her misunderstanding of whether text messages sent by Wenger would be admitted into evidence. Castronovo moved to suppress text messages from Wenger's phone, but once the government explained it would get the messages into evidence through Amiri's phone, Castronovo's motion was deemed moot. Dkt. 180 at 7. Nothing about that finding of mootness precluded the government from admitting text messages sent by Wenger to Amiri that were contained on Amiri's phone, as both the government

15

1    and Judge White made clear to Castronovo. Nonetheless, Castronovo was unprepared to deal with

2    the text messages once they were presented to the jury. *See* Dkt. 359 at 258-64. She had not filed

3    any motions in limine concerning the text messages, or moved to exclude or limit them under the

4    Federal Rules of Evidence. She seemingly had not prepared Wenger to testify, a decision that she

5    repeatedly stated was due to her belief the government would not admit the messages into

6    evidence. Dkt. 359 at 286-87.

7         We believe her misunderstanding of the text messages, coupled with her exhaustion, mental

8    health difficulties, repeated admonishments, unfamiliarity with federal criminal practice as well as

9    the Northern District of California and Judge White, and her flailing efforts to represent Wenger

10   alone, led her to seek the mistrial. As disruptive as it was, seeking a mistrial was likely the right

11   thing to do and in the best interest of her client, at least at the time the request was made. With

12   hindsight, it appears a mistrial was detrimental to Wenger because Amiri was acquitted of

13   conspiring with him while at his retrial, Wenger was convicted of conspiring with Amiri. But

14   Castronovo had no way of knowing that at the time she requested the mistrial. She could not have

15   carried on without assistance, and stopping the bleeding was better than letting the trial of Wenger

16   continue on with her ineffective assistance.

17        Her decision to spin the mistrial as a victory and make public comments about the trial

18   while the jury was still deliberating about Amiri, on the other hand, was absolutely not the right

19   thing to do, and a serious lapse in judgment.

20        Just saying anything to the press and on YouTube about the trial while Amiri's case was

21   pending was a direct violation of Judge White's admonition to jurors—applicable to attorneys as

22   well—not to discuss the case until it was concluded.

23        Castronovo's comments potentially violated California Rule of Professional Conduct

24   3.6(a), which generally bars an attorney from making an "extrajudicial statement that the lawyer

25   knows or reasonably should know will (i) be disseminated by means of public communication and

26   (ii) have a substantial likelihood of materially prejudicing an adjudicative proceeding."

27

28

Castronovo's statements went beyond commenting on Wenger's situation, and included commentary on Amiri. She noted she wanted Wenger severed from Amiri because he (and Rombough presumably) "had a lot of use [of force] before, some of them had a lot of bad texts" and she did not want Wenger tainted with "guilt by association." These comments could certainly have prejudiced the trial if a juror watched the interview and heard these statements.

Moreover, Castronovo's statements left a misleading impression to the public that the mistrial was a result of her strategic brilliance rather than her incompetence. In particular, Castronovo's comments on the YouTube video in *10-19 The Watch Commander: Cops in The News*, were highly misleading, and sometimes downright false, concerning the circumstances that led to the mistrial.

The recording is one hour and forty minutes long and will not be recited in detail here; it is still available on YouTube.[7]

The most important comments made by Castronovo occur at approximately 50 minutes into the video and go on for approximately ten minutes. Her comments include:

- Wenger's "case has ended in a mistrial. Um, the reasons of which we can't disclose because it was sealed proceeding."

- "So, um, you know, you guys agree with me and amongst my LAPD and LASD and SBSD and all the folks down here gotten to know me over the years, so I don't really get this treatment. But going back to the bay after being gone for six, seven years and not really being a known commodity anymore, um, man did they sleep on me a lot? They treated me like I was stupid sometimes downright, uh, implied I was stupid. The prosecution, um, uh, laughed at me in court sometimes. Um, uh, did all sorts of crazy hijinks I've never seen."

- Concerning the government's admission of text messages sent by Wenger through Amiri's cell phone, "I tried to explain that to the judge. I was like, the prosecution's being a little too cute with you and I don't appreciate this in large part because it's a lie. But in part as an attorney, I didn't appreciate it because that informs my decisions on making the case as a defendant. You have the Fifth Amendment right to testify. I make a decision case by case as to whether my defendant will testify as you seem. This is an ace in the hole. But I didn't wanna have him testify 'cause I didn't want him to get impeached. So I kept him off the

---

[7] *10-19 The Watch Commander: Cops in The News with Nicole Lopes and Rich Lewis*, Mar. 12, 2025, https://www.youtube.com/watch?v=CHgxqT35I8U. At the time the Court reviewed the video, it had 802 views. Dkt. 387 at 2. As of December 11, 2025, the video had over 1,700 views.

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

stand. So I made that representation to the court too. I was like, this fucked up everything that I had planned, and you're gonna let 'em get away with that. And the court did."

- "So here's the beauty of where Dev[o]n is now, and no one saw 'em coming. 'cause everyone thought I was a fucking idiot. Um, and some reporter in the bay ran that after the mistrial, that there was a mistrial because I, uh, I looked crying and disheveled and a mess leaving court. Like all sorts of crazy shit. The truth of the matter is this, that Dev[o]n now has a mistrial. I had tried to seven sever Dev[o]n away from his other defendants, which basically means get his keys separated because I didn't wanna guilt by association. Some of them had a lot of use before, some of them had a lot of bad texts. Whatever it was, he has one use of force. I don't want him next to everybody else, right?…And, um, the court denied our motion to sever Devon away. So he was going to be tried with his co-defendants no matter what. That also meant that if he took the stand when once I saw what the prosecution did too, right, with the text messages that he promised, he'd keep out. He brought 'em in…Um, that changed whether I could have Dev[o]n testify or not. And, um, all I can say is this is the best possible outcome for him. We were down in the count, you know, we were really down in the count with all these things working against us. But now as Devon sits here today, he's got a mistrial. He will never be tried with any of these co-defendants ever again. If they decide to refile on him, if they decide to refile on him, they already promised they wouldn't use any of its text messages. So they don't get that. So all they're left with is one goddamn deployment of the 40 on a GTA felony suspect with a bruise that was not hurt, that declined medical. That's all they have left if they wanna refile against fucking Captain America over here. So I, that that's the decision that's to be made. So that's all I can say on it. It's sealed, but that's what it is."

Castronovo's error was compounded by her suggestion that the Court had "sealed" the "truth," implying the Court was trying to cover up some grave injustice. In reality, the transcript and order granting the mistrial were sealed to protect Castronovo's personal and medical privacy and spare her the embarrassment and professional humiliation from her admission that she had been ineffective at trial and unable to proceed further.

Northern District of California Guideline for Professional Conduct 18 states "Lawyers should conduct themselves with clients, opposing counsel, parties and the public in a manner consistent with the high respect and esteem which lawyers should have for the courts, the civil and criminal justice systems, the legal profession and other lawyers." It continues that lawyers "should not make statements which are false, misleading, or which exaggerate" the lawyer's performance,

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

nor "create a false or misleading record of events."[8] Castronovo's statements clearly violate these Guidelines. As they were made while the trial of Wenger's co-defendant was still ongoing, they risked tainting the proceedings, would have created a false and misleading impression of the circumstances that led to the mistrial, create the appearance of gamesmanship of the proceedings in a criminal trial, and, overall, they undermine the integrity of the federal judicial system.

The Committee ultimately takes Castronovo at her word to Judge White on March 5, 2025: that she was ineffective and incompetent to continue with the trial. The Committee rejects her after-the-fact spin in the press and on YouTube that the mistrial was somehow a victory. Given the professional and reputational damage Castronovo has suffered, and the fact Wenger was convicted at a retrial on the very charge his co-defendant was acquitted on, neither have "won" anything.

### Findings and Resolution

Castronovo's ineffectiveness seems remediable, provided she has adequate supervision and training on, and familiarity with, federal criminal practice, the Federal Rules of Criminal Procedure, the Northern District's Local Rules and professional culture, and the standing orders of individual judges she appears before. As for the post-mistrial statements, the Committee believes that Castronovo needs a refresher on what kinds of public communications attorneys are permitted to make, as well as knowledge of the Northern District's Guidelines for Professional Conduct that establish how attorneys should comport themselves and communicate about the legal system.

There are also mitigating circumstances present. Castronovo has self-admitted mental health challenges, did seem to try her best at trial, took the bold—and professionally detrimental—effect of seeking a mistrial rather than continue on incompetently, and has paid a steep reputational price for her conduct. When Castronovo met with the Committee, she was emotional and confirmed that her comments on the YouTube podcast were not intended to suggest that she manufactured a mistrial to get a benefit for Wenger. She explained she had learned painful lessons from the experience and suffered a steep price. She lost her job at the firm. She is under

---

[8] Northern District of California Guidelines for Professional Conduct, https://cand.uscourts.gov/forms/guidelines-for-professional-conduct/.

investigation by the State Bar and, given the press attention the case has received, will likely face challenges obtaining business in the future.

Thus, the Committee recommends, and Castronovo has agreed, that as a condition of maintaining her admission in the Northern District, Castronovo be placed on a period of probation for three years with the following conditions:

1. Castronovo is to familiarize herself with the Federal Rules of Criminal Procedure, the Northern District of California's Local Criminal Rules, and the Northern District of California's Guidelines for Professional Conduct;

2. Castronovo is to attend—and provide the Committee with proof of attendance—10 hours of continuing legal education specific to federal criminal practice;

3. She is to identify co-counsel familiar with federal criminal practice, and ideally with the Northern District, before entering an appearance in any Northern District criminal case; co-counsel should file a notice of appearance in the case and be available to consult, mentor and assist Castronovo in the representation;

4. Castronovo is to familiarize herself with the Standing Orders of any Northern District judge she appears before and certify to the judge in writing that she has read the judge's Standing Orders;

5. Castronovo is to prepare and present a one hour continuing legal education course on the legal and ethical rules governing attorney communications with the public and press; she should provide proof to the Committee that she has prepared and given the presentation; and

6. Castronovo is to serve a copy of the final order and terms of probation on any Northern District of California judge she appears before while on probation; that filing may be made under seal if authorized by the presiding judge.

FINAL REPORT OF THE STANDING COMMITTEE ON PROFESSIONAL CONDUCT
AND ORDER,
IN RE NICOLE LOPES
CASE NO. 4:25-mc-80394-HSG

**Making this Order Public**

The Committee's orders closing referrals are usually sealed.

Civil Local Rule 11-6(e)(1) states the Committee's investigations "shall be confidential unless the Professional Conduct Liaison Judge, upon application by the Standing Committee or the attorney who is subject to the investigation, determines that there is a compelling reason to make the matter public."

The Committee believes there are compelling reasons to make the Court's order as to Castronovo public. The underlying case is of significant public interest and the mistrial received publicity in the media. More significantly, Castronovo's statements to the media and in the YouTube video painted a misleading and inaccurate picture of what led to the mistrial.

Accordingly, the Committee concludes that making the Committee's report public may serve to correct any misconceptions caused by Castronovo's public statements.

The Committee hereby requests that the Court now close this miscellaneous matter and provide notice of this Order to Castronovo at the following address:

Nicole Castronovo
Law Offices of Nicole Castronovo, PC
27001 Agoura Rd, Ste 350
Agoura Hills, CA 91301-5112
nicole@castronovolaw.com

with a copy to counsel for Castronovo:

Maryam Karson
Zelms Erlich Lenkov LLP
20920 Warner Center Lane, Suite B
Woodland Hills, CA 91367
mkarson@zellaw.com

Respectfully submitted,

Dated: December 15, 2025                     By: _/s/ Ignacio E. Salceda_____
                                             Ignacio E. Salceda, *Chair*
                                             Standing Committee on Professional
                                             Conduct for the United States District
                                             Court for the Northen District of California

21

1

**ORDER**

2          For good cause appearing, this matter, captioned *In re Nicole Lopes*, 4:25-mc-80394-HSG,

3    is hereby CLOSED.  Pursuant to Civil Local Rule 11-6(e)(1), the Court determines that there is a

4    compelling reason to make this Order public. Accordingly, this Order shall not be sealed.

5          IT IS SO ORDERED.

6

7    Dated:  12/22/2025

Haywood S. Gilliam, Jr.

8                                                                  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                                       22
28